Eric H. Gibbs (SBN 178658)
Andre Mura (SBN 298541)
Aaron Blumenthal (SBN 310605)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
amm@classlawgroup.com
ab@classlawgroup.com

*Counsel for Plaintiff and Proposed Class*

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Patricia King, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Facebook, Inc.; Cambridge Analytica LLC,<br><br>Defendants. | Case No. 18-cv-02276<br><br>**CLASS ACTION COMPLAINT**<br><br><br>DEMAND FOR JURY TRIAL |

# I.     INTRODUCTION

1.     Facebook is a social networking platform that engages in surveillance capitalism: It monetizes personal and behavioral data which it acquires through real-time surveillance of Facebook users.[1]

2.     This practice of deriving profits from the surveillance, analysis, and modification of behavior happens without the consent or knowledge of Facebook users.

3.     Public outcry over Cambridge Analytica's use of Facebook data in election campaigns confirms that Facebook has not adequately informed its members that their behaviors, social relationships, and intimate details are being used in contexts and for purposes completely different from those for which this information is provided. As widely reported, Cambridge Analytica targeted voters with personalized messages shaped by a prediction of personality traits derived from Facebook data, and it did so without Facebook users' knowledge or consent.

4.     But this exploitation of Facebook data is not limited to elections or one actor. These technologies are also applied in commercial marketing, including by Facebook. The company regularly uses its surveillance platform "to figure out your personal psychological susceptibilities and then charge(s) advertisers to exploit them."[2]

5.     The seemingly unrestricted surveillance and analysis of daily interactions and behaviors on the Facebook platform far exceeds user expectations of how personal data is used. Users are not adequately informed that Facebook regularly runs experiments on them. Nor are they adequately told that seemingly innocuous interactions on the platform, such as "liking" content, can be used to predict highly sensitive information with great accuracy, including sexual orientation, ethnicity, political or religious views, or drug use. Nor are users clearly told that, although they may set privacy settings which control the sharing of certain data on an interpersonal level, "what users cannot adjust with Facebook's privacy settings is how the platform *itself* takes advantage of the rich digital profiles it stores about users."[3] The full extent of Facebook's surveillance capitalism remains secret.

6.     Plaintiff Patricia King is among the reportedly 87 million persons in the United States

---

[1] Shoshana Zuboff, *Big Other: Surveillance Capitalism and the Prospects of an Information Civilization*, 30 J. Info. Tech. 75 (Apr. 4, 2015), *available at* http://ssrn.com/abstract=2594754.
[2] http://www.nybooks.com/daily/2018/04/12/reining-in-big-datas-robber-barons/.
[3] p. 7, https://crackedlabs.org/dl/CrackedLabs_Christl_DataAgainstPeople.pdf.

CLASS ACTION COMPLAINT
Case No. 18-cv-02276

whose Facebook data Cambridge Analytica obtained in order to build psychographic profiles for voter micro-targeting. She files this class action complaint seeking to change Facebook's business practices, for breach of contract, and for violations of federal and state law.

## II.      PARTIES

7.      Patricia King is a resident and citizen of South Carolina.

8.      On April 10, 2018, she received a notification from Facebook saying that one of her friends had used the application "This Is Your Digital Life," which may have shared "some of [her] Facebook information" with Cambridge Analytica. Facebook said the following information was likely shared: public profile, Likes, birthday, and current city of residence.

9.      Defendant Facebook, Inc., is incorporated in Delaware, and its principal place of business is in Menlo Park, California.

10.      Defendant Cambridge Analytica LLC is a Delaware limited liability company with headquarters in New York, New York.

## III.      JURISDICTION

11.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class of plaintiffs is a citizen of a state different from a defendant.

12.      This Court has personal jurisdiction over Defendant Facebook, Inc., because Facebook, Inc. is headquartered in California, and conducts business in the state of California.

13.      This Court also has personal jurisdiction over Defendant Cambridge Analytica LLC because it conducts business in California, and the challenged acts and practices occurred or were otherwise facilitated in California.

14.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in, were directed to, and/or emanated from this District. Venue is also proper because Facebook's terms of service require that claims be resolved "exclusively in the U.S. District Court for the Northern District of California."

## IV.     INTRADISTRICT ASSIGNMENT

15.     Assignment to the San Francisco division is proper because Facebook is headquartered in San Mateo County, and a substantial part of the events or omissions which give rise to the claims occurred there.

## V.     FACTUAL ALLEGATIONS

16.     Facebook has operated www.facebook.com since at least 2004. This social networking platform allows users to create online profiles with personalized content such as their name, photos, videos, messages, comments, names of other users they consider to be "friends," and interest groups. Users can interact with each other or the platform in a variety of ways, including by posting comments, sharing photos or video, chatting, using apps, playing online games, taking personality quizzes, or "liking" content by pressing a thumbs-up icon.

17.     In the past decade, Facebook's user-base has grown exponentially. It is currently the world's largest social networking platform, with about 2.2 billion active users.[4] In the United States, about 214 million persons—two-thirds of the population—use Facebook.[5]

18.     Through this platform, Facebook has amassed a massive amount of highly personalized data about its users. This includes data required by the platform, such as name, gender, e-mail address, and birthday; optional data such as hometown, interests, relationship status, education, work, and political or religious views; and data derived through behavioral or predictive analytics. Using this data, Facebook may suggest connections, guide the presentation of information on the platform, and publish targeted ads.[6]

19.     Facebook's ability to access information about users and their tastes and preferences is key to its business model. For example, when a user "likes" a comment, article, or video, this generates information about the user. Facebook is then able to help advertisers target—or exclude—users based on their tastes and preferences.

---

[4] https://www.statista.com/statistics/272014/global-social-networks-ranked-by-number-of-users/ (last accessed Mar. 28, 2018)
[5] https://www.statista.com/statistics/398136/us-facebook-user-age-groups/ (last accessed Mar. 28, 2018) (Facebook has 214 million active users in the U.S.); the total U.S. population is 325.7 million.
[6] https://www.wired.com/insights/2014/03/facebook-decade-big-data/.

CLASS ACTION COMPLAINT
Case No. 18-cv-02276

20.     While Facebook "does not directly, for the most part, sell or share their detailed digital consumer profiles to third parties, at least not in the form of unified dossiers," it allows other companies to "utilize" the data "without fully transferring it."[7] Facebook also allows other companies to use its infrastructure to collect more data.

21.     As persons share information with friends or family through the Facebook platform, the data generated is used for ad targeting and generates massive revenue for Facebook—$40 billion just last year.

**A.**

22.     Since 2004, Facebook has made several important adjustments to its platform that alter the way it uses, or allows others to use, personal data.

23.     When Facebook launched its ad platform in 2007, it allowed advertisers to target users based on information they volunteered in their profiles.

24.     In 2009, Facebook added the "Like" button and allowed advertisers to target users based on their Likes. In addition, Facebook added a feature that allowed advertisers to target the Facebook friends of people who had Liked or otherwise interacted with their brand.

25.     In 2012, Facebook created a feature that allowed companies to upload their own lists of e-mail addresses and phone numbers and have Facebook match this information to the customers' Facebook accounts. Companies could then target, or exclude, subsets of these individuals based on other information in Facebook's possession. "Today companies can capture information about very particular activities – such as specific webpage activities, swipes in a smartphone app, or types of purchases – in real-time and tell Facebook to immediately find and target the persons who performed these activities."[8]

26.     In 2014, Facebook started allowing advertisers to target users based on their behavior on other websites. Facebook tracks users across any website that contains a "Like" button (e.g. "Click here to Like us on Facebook"). If, for example, someone was, reading reviews about tents, Facebook would

---

[7] p. 11, http://crackedlabs.org/dl/CrackedLabs_Christl_CorporateSurveillance.pdf (italics removed).
[8] p. 47, http://crackedlabs.org/dl/CrackedLabs_Christl_CorporateSurveillance.pdf.

CLASS ACTION COMPLAINT
Case No. 18-cv-02276

1    let advertisers target that person as someone "interested in camping."[9]

2        27.    Around the same time, Facebook started allowing advertisers to target people based on

3    "Ethnic Affinity," which can be used as a proxy for race.[10] Individuals who "Like" numerous rap artists

4    might be "categorized as African-American."[11]

5        28.    Beginning in 2013, Facebook partnered with several data brokers, including Acxiom and

6    companies later acquired by Oracle. By 2017, six data brokers provided Facebook with "audience

7    data," the better to categorize and segment users.[12] Then, in 2018, after Cambridge Analytica's use of

8    Facebook data was widely publicized, Facebook severed ties with data brokers.

9    **B.**

10       29.    The Harvard academic Shoshana Zuboff has coined the term "surveillance capitalism" to

11   describe the "monetization of free behavioral data acquired through surveillance and sold on to entities

12   with an interest in your future behavior."[13] Under this form of capitalism, companies engage in

13   pervasive real-time surveillance and, "[b]ased on data-driven predictive analytics, personalization,

14   measurement, and testing, they aim to influence behavior at scale. In the background, consumers are

15   constantly evaluated, sorted, categorized, and ranked in order to treat them on a case-by-case basis as

16   best fits a company's business interests."[14] "This personalized and dynamic form of behavioral nudging

17   gives surveillance corporations repeated opportunities to manipulate user behavior."[15]

18       30.    Unbeknownst to most Facebook users, predictive analysis can reveal previously

19   unknown information from seemingly impersonal data. According to a 2013 study by Cambridge

20   University's Psychometrics Centre, an analysis of only Facebook Likes could predict a user's skin color

21   (with 95% accuracy), sexual orientation (with 88% accuracy), and whether they were a Democrat or

22   Republican (with 85% accuracy). With a "high degree of accuracy," researchers were also able to make

23   predictions about the person's intelligence, and physical and mental health.[16] Researchers could more

24

25   [9] https://www.nytimes.com/interactive/2018/04/11/technology/facebook-sells-ads-life-details.html.
     [10] Id.

26   [11] Id.
     [12] https://www.facebook.com/business/a/facebook-partner-categories.

27   [13] https://amp.theguardian.com/technology/2016/may/02/google-microsoft-pact-antitrust-surveillance-capitalism (citing
     Shoshona Zuboff, *The Secrets of Surveillance Capitalism*, Frankfurter Allgemeine (May 3, 2016).

28   [14] http://crackedlabs.org/dl/CrackedLabs_Christl_CorporateSurveillance.pdf.
     [15] http://www.nybooks.com/daily/2018/04/12/reining-in-big-datas-robber-barons/.
     [16] http://www.pnas.org/content/110/15/5802.

CLASS ACTION COMPLAINT
                                                                Case No. 18-cv-02276

1  accurately predict a user's personality than could a user's Facebook friends or family, although the

2  algorithm was slightly less accurate than users' spouses.

3  *Analyzing Facebook likes, phone data, and typing patterns*



Source: http://crackedlabs.org/en/corporate-surveillance

31.     Another study by Sandra Matz, a professor at Columbia Business School, used

psychographic targeting on 3.5 million Facebook users. Matz analyzed users' Facebook Likes to

determine whether they were extraverted or introverted. Matz targeted extraverts on Facebook with an

advertisement for makeup showing a woman at a crowded party, with the message "dance like no one

is watching (but they totally are)."[17] And she targeted introverts with an ad showing only a makeup

brush, with the caption "beauty doesn't have to shout."[18] The Facebook ads that used psychographic

targeting got 40 percent more clicks and resulted in 50 percent more purchases.

32.     Facebook has long understood, but has never adequately disclosed to users, that the data

it collects through its platform allows it "to figure out your personal psychological susceptibilities and

then charge advertisers to exploit them."[19] In fact, Facebook itself has regularly experimented on users.

33.     In 2012, Facebook secretly manipulated the news feeds of 1.9 million users during the

---

[17] https://www.theverge.com/2018/3/20/17138854/cambridge-analytica-facebook-data-trump-campaign-psychographic-microtargeting.

[18] Id.

[19] http://www.nybooks.com/daily/2018/04/12/reining-in-big-datas-robber-barons/.

CLASS ACTION COMPLAINT
Case No. 18-cv-02276

2012 United States congressional elections. It found that showing more "hard" news instead of personal posts, such as baby photos, increased voter turnout.[20]

34.    That same year, Facebook conducted a "mood experiment" on almost 700,000 users that "manipulat[ed] the amount of emotionally positive and negative posts in the users' news feeds, which influenced how many emotionally positive and negative messages the users posted themselves."[21]

35.    More recently, in 2017, "a leaked internal Facebook document revealed how the platform provides an advertiser the opportunity to target 6.4 million young Australians in 'moments when young people need a confidence boost' such as when they felt, 'worthless,' 'insecure,' 'stressed,' 'defeated,' 'anxious,' or like a 'failure' based on 'internal Facebook data' such as posts and photos."[22] Although Facebook says this research was never used to target ads, it is reportedly building a neuroscience lab, and it has publicly touted research about neuroscience and the ability of marketers to "'capitalize' on 'very important, highly personal and uniquely relevant moments' of users."[23]

## C.

36.    These tactics have also been used in election campaigns. Most prominently, Cambridge Analytica has used Facebook data to construct psychographic profiles of millions of people in the United States without their consent or knowledge.

37.    According to documents provided by whistleblower Christopher Wylie, Cambridge Analytica first began to use Facebook data to build psychological profiles of users in 2014, with the aid of Aleksandr Kogan, a professor of psychology in the U.K.[24] Kogan's contract with Cambridge Analytica says that Kogan will perform "data harvesting," using "a pre-existing application functioning under Facebook's old [API] because "[n]ew applications are not able to access friend" data.[25]

38.    Kogan used his application, a personality quiz called "thisisyourdigitallife," to collect "data about the 270,000 people who installed it, along with data about their Facebook friends," totaling

[20] https://www.motherjones.com/politics/2014/10/can-voting-facebook-button-improve-voter-turnout/.
[21] http://crackedlabs.org/en/corporate-surveillance.
[22] p. 41, https://crackedlabs.org/dl/CrackedLabs_Christl_DataAgainstPeople.pdf.
[23] Id.
[24] p. 69, https://www.parliament.uk/documents/commons-committees/culture-media-and-sport/Chris%20Wylie%20Background%20papers.pdf; https://techcrunch.com/2018/03/29/heres-cambridge-analyticas-plan-for-voters-facebook-data/.
[25] p. 40, 84, https://www.parliament.uk/documents/commons-committees/culture-media-and-sport/Chris%20Wylie%20Background%20papers.pdf.

CLASS ACTION COMPLAINT
Case No. 18-cv-02276

87 million people in all.[26]

39. During the collection process, *The Guardian* reports,"[t]he scale of the data collection … was so large it triggered an automatic shutdown of the app's ability to harvest profiles."[27] But Kogan had inside contacts at Facebook because he co-authored a study with two Facebook employees.[28] Kogan "spoke with an engineer" at Facebook and had his app up and running again "within a day or two," says *The Guardian*.[29]

40. Christopher Wylie said that Cambridge Analytica "exploited Facebook to harvest millions of people's profiles. And [it] built models to exploit what [it] knew about them and target their inner demons. That was the basis the entire company was built on."[30] Cambridge Analytica used its newly acquired Facebook data to construct psychological profiles on tens of millions of Americans, giving them labels such as "neurotic introvert," "religious extrovert," "fair-minded liberal," or "fan of the occult." [31] "Those were among the psychological traits the firm claimed would provide a uniquely powerful means of designing political messages."[32]

41. In 2015, *The Guardian* reported that "Ted Cruz's presidential campaign is using psychological data based on research spanning tens of millions of Facebook users, harvested largely without their permission… As part of an aggressive new voter-targeting operation, Cambridge Analytica … is now using so-called 'psychographic profiles' of US citizens in order to help win Cruz votes."[33]

42. In 2016, Cambridge Analytica began working for the Trump campaign.[34] Until the hiring of Cambridge Analytica, *Vice* says, "Trump's digital campaign had consisted of more or less one person: Brad Parscale, a marketing entrepreneur and failed start-up founder who created a rudimentary website for Trump for $1,500."[35] Cambridge Analytica helped turn digital marketing into what *60*

---

[26] https://www.nytimes.com/2018/03/19/technology/facebook-data-sharing.html; https://www.wired.com/story/facebook-exposed-87-million-users-to-cambridge-analytica/.

[27] https://www.theguardian.com/technology/2018/mar/17/facebook-cambridge-analytica-kogan-data-algorithm.

[28] http://www.kbtx.com/content/news/Israel-investigating-Facebook-over-data-case-477645443.html.

[29] https://www.theguardian.com/technology/2018/mar/17/facebook-cambridge-analytica-kogan-data-algorithm.

[30] https://www.theguardian.com/news/2018/mar/17/cambridge-analytica-facebook-influence-us-election.

[31] https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html.

[32] https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html.

[33] https://www.theguardian.com/us-news/2015/dec/11/senator-ted-cruz-president-campaign-facebook-user-data.

[34] https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html.

[35] https://motherboard.vice.com/en_us/article/mg9vvn/how-our-likes-helped-trump-win.

CLASS ACTION COMPLAINT
Case No. 18-02276

*Minutes* calls Trump's "secret weapon."[36]

43.    According to former Trump campaign officials, Cambridge Analytica "performed a variety of services" for the campaign, including "designing target audiences for digital ads and fund-raising appeals, modeling voter turnout, buying $5 million in television ads and determining where Mr. Trump should travel to best drum up support."[37] Alexander Nix, CEO of Cambridge Analytica, says, "Pretty much every message that Trump put out was data-driven."[38] *Vice* reports that in the run-up to the third presidential debate, "Trump's team tested 175,000 different ad variations for his arguments … all via Facebook."[39]

44.    Starting in July 2016, says *Vice,* "Trump's canvassers were provided with an app with which they could identify the political views and personality types of the inhabitants of a house. … Trump's people only rang at the doors of houses that the app rated as receptive to his messages. The canvassers came prepared with guidelines for conversations tailored to the personality type of the resident."[40] Cambridge Analytica used "psychometric profiling" to divide the "US population into 32 personality types," reports *Vice*, and they "focused on just 17 states" that had swing voters most receptive to Trump's messaging.[41] For example, Cambridge Analytica "discovered that a preference for cars made in the US was a great indication of a potential Trump voter."[42] Cambridge Analytica also helped Trump tailor his messages to find what "worked best and where," which influenced"[t]he decision to focus on Michigan and Wisconsin in the final weeks of the campaign."[43]

45.    After Trump's electoral victory, Cambridge Analytica's CEO, Alexander Nix, boasted, "We did all the research, all the data, all the analytics, all the targeting, we ran all the digital campaign, the television campaign and our data informed all the strategy."[44] And "another senior executive says

---

[36] https://motherboard.vice.com/en_us/article/mg9vvn/how-our-likes-helped-trump-win;
https://www.cbsnews.com/news/facebook-embeds-russia-and-the-trump-campaigns-secret-weapon/.
[37] https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html.
[38] https://motherboard.vice.com/en_us/article/mg9vvn/how-our-likes-helped-trump-win.
[39] https://motherboard.vice.com/en_us/article/mg9vvn/how-our-likes-helped-trump-win.
[40] https://motherboard.vice.com/en_us/article/mg9vvn/how-our-likes-helped-trump-win.
[41] https://motherboard.vice.com/en_us/article/mg9vvn/how-our-likes-helped-trump-win.
[42] https://motherboard.vice.com/en_us/article/mg9vvn/how-our-likes-helped-trump-win.
[43] https://motherboard.vice.com/en_us/article/mg9vvn/how-our-likes-helped-trump-win.
[44] https://www.npr.org/sections/thetwo-way/2018/03/21/595470164/in-hidden-camera-expose-cambridge-analytica-executives-boast-of-role-in-trump-wi.

1  the 'defeat crooked Hillary' advertising campaign was the brainchild of the firm."[45] *Vice* says, "The

2  fact that Trump spent so little money may also be explained by the effectiveness of personality-based

3  advertising."[46]

4      46.    During this time, Facebook failed to take appropriate corrective action, despite being

5  aware that Cambridge Analytica was using Facebook data in this manner. Although Facebook appears

6  to have corresponded with Cambridge Analytica and asked it to cease using the data, Facebook failed to

7  undertake an audit of Cambridge Analytica during these election campaigns.[47]

8      47.    Facebook's failure to take action was typical, according to a former Facebook privacy

9  officer.[48] Sandy Parakilas, who worked at Facebook in 2011 and 2012, says he "led the team

10  responsible for data policy violations on Facebook App Platform."[49] Parakilas says, "The company

11  cared little about protecting users' data then, and the Cambridge Analytica story shows that hasn't

12  changed."[50]

13      48.    "At the time that Kogan was gathering data on behalf of Cambridge Analytica,"

14  Parakilas explains, "Facebook also allowed developers to access your friends' data, even though those

15  friends had never agreed to connect to the app."[51] But "once the data passed from Facebook's servers to

16  the developer, Facebook lost all insight into or control over how the data was used."[52] "To prevent

17  abuse, Facebook created a set of platform policies that forbade certain kinds of activity."[53] But

18  Facebook's enforcement was "lax."[54] According to Parakilas, the reason was that "Facebook didn't

19  want to make the public aware of huge weaknesses in its data security."[55]

20      49.    Parakilas points out that Facebook didn't even ban Cambridge Analytica or Aleksandr

---

[45] https://www.npr.org/sections/thetwo-way/2018/03/21/595470164/in-hidden-camera-expose-cambridge-analytica-executives-boast-of-role-in-trump-wi.

[46] https://motherboard.vice.com/en_us/article/mg9vvn/how-our-likes-helped-trump-win.

[47] https://www.theguardian.com/news/2018/mar/17/cambridge-analytica-facebook-influence-us-election.

[48] https://www.washingtonpost.com/opinions/i-worked-at-facebook-i-know-how-cambridge-analytica-could-have-happened/2018/03/20/edc7ef8a-2bc4-11e8-8ad6-fbc50284fce8_story.html.

[49] https://www.washingtonpost.com/opinions/i-worked-at-facebook-i-know-how-cambridge-analytica-could-have-happened/2018/03/20/edc7ef8a-2bc4-11e8-8ad6-fbc50284fce8_story.html.

[50] https://www.washingtonpost.com/opinions/i-worked-at-facebook-i-know-how-cambridge-analytica-could-have-happened/2018/03/20/edc7ef8a-2bc4-11e8-8ad6-fbc50284fce8_story.html.

[51] Id.

[52] Id.

[53] Id.

[54] Id.

[55] Id.

CLASS ACTION COMPLAINT
Case No. 18-cv-02276

Kogan from the platform until March 16, 2018, "when whistleblowers and news stories forced" its hand.[56] And though Facebook maintains that Cambridge Analytica's use of Facebook data violated its terms, Kogan disagrees that there was any violation of Facebook's rules. Instead, he maintains that the terms of service for "This Is Your Digital Life" put Facebook on notice that this Facebook data could be sold.[57]

**D.**

50.     To date, Facebook is not able to say that the Cambridge Analytica experience is an outlier. After the revelations about Cambridge Analytica, according to *CNN*, Facebook CEO Mark "Zuckerberg said Facebook will review all apps that have been pulling large amounts of data about users since 2014 and earlier."[58] "We're going to review thousands of apps," said Zuckerberg.[59] In subsequent congressional testimony, Zuckerberg changed the number to "tens of thousands" of apps.[60] Zuckerberg said that "[t]his is something that in retrospect we clearly should have done, upfront."[61]

51.     Although Facebook has recently changed privacy settings, those settings control the sharing of certain data on an interpersonal level. But "what users cannot adjust with Facebook's privacy settings is how the platform *itself* takes advantage of the rich digital profiles it stores about users."[62]

52.     Facebook does not inform users of the scope of its personal and behavioral data analytics. According to *TechCrunch*, Facebook's terms of service are "too long" and "written in impenetrable legalese, intentionally vague and hyper-qualified language that's designed to make it impossible for you to understand."[63] Facebook's "Terms of Service" page contains links to 30 other pages, many of which contain additional terms and conditions.[64] For example, the "Terms of Service" page links to Facebook's "Data Policy," which itself contains another 22 links.[65] *TechCrunch* tried to

---

[56] Id.
[57] http://fortune.com/2018/04/10/facebook-cambridge-analytica-what-happened/; https://www.thedailybeast.com/oops-mark-zuckerberg-surprised-to-learn-the-terms-of-service-for-your-digital-life.
[58] http://money.cnn.com/2018/03/21/technology/facebook-changes-data-scandal/index.html?iid=EL.
[59] Id.
[60] https://nypost.com/2018/04/11/zuckerberg-facebook-auditing-tens-of-thousands-of-apps-after-scandal/.
[61] http://money.cnn.com/2018/03/21/technology/facebook-changes-data-scandal/index.html?iid=EL.
[62] p. 7, https://crackedlabs.org/dl/CrackedLabs_Christl_DataAgainstPeople.pdf.
[63] https://techcrunch.com/2015/08/21/agree-to-disagree/.
[64] https://www.washingtonpost.com/news/the-switch/wp/2018/04/10/transcript-of-mark-zuckerbergs-senate-hearing/?utm_term=.9c5c8e65c15f.
[65] https://www.washingtonpost.com/news/the-switch/wp/2018/04/10/transcript-of-mark-zuckerbergs-senate-hearing/?utm_term=.9c5c8e65c15f.

CLASS ACTION COMPLAINT
Case No. 18-cv-02276

count the total number of words spread across the various pages, but gave up after the word count hit 15,000.[66]

53.     What's more, Facebook users do not reasonably expect that Facebook and third parties are engaged in data collection, profiling, behavioral nudging, experimentation, and manipulation. Researchers at *Digital Content Next* recently asked consumers about what types of information they expected Facebook to collect and use in targeting them with advertising. Fifty-six percent said they expected Facebook to collect data about their activities on Facebook and other applications it owns, such as Instagram and WhatsApp.[67] But 61% said they didn't expect Facebook "to track a person's usage of apps that Facebook does not own"; 65% did not "expect Facebook to buy personal information from data companies and merge with a person's online usage"; and 69% did not expect Facebook "to collect data about a person's location when a person is not using Facebook."[68] When informed of Facebook's data collection practices, users "do *not* approve" of Facebook collecting this type of data about them.[69]

## VI.     CLASS ALLEGATIONS

54.     Plaintiff brings this nationwide class action, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following Class:

> All persons whose information or behavioral data was accessed, directly or indirectly, from the Facebook platform by Cambridge Analytica or other entities without the person's consent or knowledge.

55.     Excluded from the Class are the following individuals and/or entities: Defendants and their parents, subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards,

---

[66] https://techcrunch.com/2015/08/21/agree-to-disagree/.
[67] http://www.niemanlab.org/2018/04/jason-kint-here-are-5-ways-facebook-violates-consumer-expectations-to-maximize-its-profits/.
[68] Id.
[69] Id.

CLASS ACTION COMPLAINT
Case No. 18-cv-02276

1  sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this

2  litigation, as well as their immediate family members.

3      56.    Plaintiff reserves the right to modify or amend the definition of the proposed Class

4  before the Court determines whether certification is appropriate.

5      57.    Numerosity. The Class is so numerous that joinder of all members is impracticable.

6  There are more than 166 million Facebook account holders in the United States. As discussed above,

7  the number of individuals whose information or behavioral data was downloaded by third party apps is

8  likely in the tens or even hundreds of millions and is identifiable and ascertainable based on Facebook's

9  records.

10     58.    Commonality. There are questions of law and fact common to the Class, which

11  predominate over any questions affecting only individual Class members. These common questions of

12  law and fact include, without limitation:

13          a.   Whether Facebook represented that it would safeguard Plaintiff's and Class members'

14               personal information and not disclose it without consent;

15          b.   Whether Facebook was aware of Cambridge Analytica's improper collection of

16               Plaintiff's and Class members' personal information;

17          c.   Whether Facebook owed a legal duty to Plaintiff and the Class to exercise due care in

18               collecting, storing, safeguarding, and/or obtaining their personal information;

19          d.   Whether Facebook breached a legal duty to Plaintiff and the Class to exercise due care

20               in collecting, storing, safeguarding, and/or obtaining their personal information;

21          e.   Whether Facebook's conduct was an unlawful or unfair business practice under Cal.

22               Bus. & Prof. Code § 17200, et seq.;

23          f.   Whether Defendants intruded upon Plaintiff and Class members' seclusion, or converted

24               their information or behavioral data;

25          g.   Whether Plaintiff and the Class are entitled to equitable relief, including, but not limited

26               to, injunctive relief and restitution;

27          h.   Whether Plaintiff and the other Class members are entitled to actual, statutory, or other

28               forms of damages, and other monetary relief.

CLASS ACTION COMPLAINT
Case No. 18-cv-02276

59.     Typicality. Plaintiff's claims are typical of those of other Class members because Plaintiff's information, like that of every other Class member, was misused and/or disclosed without permission by Facebook to third parties.

60.     Adequacy. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's Counsel are competent and experienced in litigating privacy-related class actions.

61.     Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

62.     Damages for any individual Class member are likely insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendants' violations of law inflicting substantial damages in the aggregate would go unremedied without certification of the Class.

63.     Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2), because Defendants have acted or have refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

## COUNT I:  BREACH OF CONTRACT
### (*against Facebook*)

64.     Plaintiff incorporates all allegations as if fully set forth herein.

65.     Facebook entered into a contract with Plaintiff and Class members, which includes terms covering privacy and limiting the use and sharing of Plaintiff's and Class members' information.

66.     Facebook says that its "Statement of Rights and Responsibilities ('Statement,' 'Terms,' or 'SRR') derives from the Facebook Principles, and is our terms of service that governs our relationship with users and others who interact with Facebook."[70]

67.     The SSR requires users to provide only real information to Facebook: "You will not

---

[70] https://web.archive.org/web/20141127001916/https://www.facebook.com/terms.php.

CLASS ACTION COMPLAINT
Case No. 18-cv-02276

provide any false personal information on Facebook…"[71]

68.   In exchange for users' providing real information, Facebook promises to protect their data.

    a.   The SSR says, "You own all of the content and information you post on Facebook, and you can control how it is shared… We require applications to respect your privacy…"[72]

    b.   The SSR says, "If [developers] collect information from users, [they] will: obtain their consent…"[73]

    c.   The SSR says, "[Developers] will not directly or indirectly transfer any data [they] receive from us to (or use such data in connection with) any ad network, ad exchange, data broker, or other advertising related toolset, even if a user consents to that transfer or use."

    d.   The Facebook Principles, incorporated by reference in the SSR, say, "People should own their information. They should have the freedom to share it with anyone they want and take it with them anywhere they want, including removing it from the Facebook Service. People should have the freedom to decide with whom they will share their information…"[74]

    e.   Facebook's Platform Policies, incorporate by reference in the SSR, say, "We can audit [a developer's] app to ensure it is safe and does not violate our Terms."[75]

69.   Plaintiff and Class members did everything required of them under the contract or were excused from doing so, and all conditions for Facebook's performance are met.

70.   Facebook breached its contract with its users by, among other things: allowing developers to download friends' data without the friend's knowledge or consent; failing to enact proper safeguards to ensure that developers did not share users' data with data brokers or other third parties; failing to audit applications that accessed suspicious amounts of user data; failing to adequately ensure that developers or third parties who violated Facebook's Terms deleted the data they had obtained and

[71] https://web.archive.org/web/20141127001916/https://www.facebook.com/terms.php.
[72] https://web.archive.org/web/20141127001916/https://www.facebook.com/terms.php.
[73] https://web.archive.org/web/20141127001916/https://www.facebook.com/terms.php.
[74] https://web.archive.org/web/20141127152204/https://www.facebook.com/principles.php.
[75]

CLASS ACTION COMPLAINT
Case No. 18-cv-02276

1   were blocked from the Facebook platform; and embedding teams within election campaigns, including

2   in the Trump campaign, to teach them how to influence elections using Facebook.

3       71.   Facebook also breached its duty to perform with reasonable care. Facebook failed to

4   implement adequate levels of privacy and security protections to safeguard users' data.

5       72.   Facebook also breached its duty of good faith and fair dealing. Facebook failed to make

6   a good faith effort to safeguard users' data and dealt unfairly with Plaintiff and Class members, by

7   inadequately securing their information.

8       73.   Facebook users did not receive the bargained-for level of privacy or security.

9       74.   As a result of Facebook's breach of contract, Plaintiff and Class members suffered

10   actual damages, including (but not limited to) loss of benefit of the bargain, exposure to a heightened

11   and imminent risk of fraud or identity theft, loss of value of their personal information, and the cost of

12   taking preventative measures.

### COUNT II:  INTRUSION ON SECLUSION
(*against all Defendants*)

15       75.   Plaintiff incorporates all allegations as if fully set forth herein.

16       76.   Plaintiff and Class members have reasonable expectations of privacy in their online

17   behavior.

18       77.   The reasonableness of such expectations of privacy is supported by Facebook's

19   statements in its SSR and its unique position to monitor Plaintiff's, Class members', and third parties'

20   behavior on its platform. It is further supported by the surreptitious, highly-technical, and non-intuitive

21   nature of the way in which app developers could access and download friends' data, without their

22   knowledge or consent.

23       78.   Facebook intentionally intruded on and into Plaintiff's and Class members' solitude,

24   seclusion, and private affairs. Facebook intentionally designed its platform—and established

25   commensurate policies and procedures governing such platform—to enable app developers to access as

26   much user data as possible, without the need for authorization from users. Facebook intended to receive

27   a financial benefit from this broad access. Facebook also intentionally established a pattern and practice

28   of lax enforcement of the policies and procedures governing its platform because it benefited from

1  violators continuing to access the Facebook platform.

2        79.     Cambridge Analytica also intentionally intruded on and into Plaintiff's and Class

3  members' solitude, seclusion, and private affairs. Cambridge Analytica intentionally gained access to

4  Plaintiff's and Class members information and behavioral data from the Facebook platform, without

5  their knowledge or consent. Cambridge Analytica intentionally used this information to construct

6  psychological profiles, craft and tailor messaging to Plaintiff and Class members, and influence

7  elections.

8        80.     These intrusions are unreasonable and highly offensive to a reasonable person. This is

9  evidenced by, among other things, the immense outcry following the revelation of these acts and

10 practices—not only from the public, but also from regulators and legislators. Further, the extent of the

11 intrusion cannot be fully known, as the nature of privacy invasion involves sharing Plaintiff's and Class

12 members' information and behavioral data with potentially countless third parties, known and

13 unknown, for undisclosed and potentially unknowable purposes, in perpetuity. Also supporting the

14 highly offensive nature of Defendants' conduct is the fact that Defendants' principal goal was to

15 surreptitiously share Plaintiff's and Class members' data for their own enrichment, and the length of

16 time before Facebook attempted to notify Plaintiff and Class members that their data had been

17 harvested by third parties.

18       81.     Plaintiff and Class members did not consent or invite Defendants' intrusions.

19       82.     Plaintiff and Class members were harmed by these intrusions into their private affairs.

20       83.     Defendants' actions and conduct complained of herein were a substantial factor in

21 causing the harm suffered by Plaintiff and Class members.

22       84.     As a result of Defendants' actions, Plaintiff and Class members seek nominal and

23 punitive damages in an amount to be determined at trial. Plaintiff and Class members seek punitive

24 damages because Defendants' actions—which were malicious, oppressive, and willful—were

25 calculated to injure Plaintiff and made in conscious disregard of Plaintiff's rights. Punitive damages are

26 warranted to deter Defendants from engaging in future misconduct.

27 /

28 /

CLASS ACTION COMPLAINT
Case No. 18-cv-02276

**COUNT III: INVASION OF CONSTITUTIONAL RIGHT OF PRIVACY**
(*against Facebook*)

85.    Plaintiff incorporates all allegations as if fully set forth herein.

86.    Article I, section 1 of the California Constitution states: "All people are by nature free and independent and have inalienable rights," including "obtaining safety, happiness, and privacy."

87.    "The right to privacy in the California Constitution sets standards similar to the common law tort of intrusion." *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 287 (2009). Plaintiff specifically incorporates by reference the allegations in Count II.

88.    Liability against a private party will lie for invading the constitutional right to privacy where: (1) the plaintiffs "possess a legally protected privacy interest," such as "conducting personal activities without observation, intrusion, or interference,", as determined by "established social norms"; (2) the plaintiffs had a reasonable expectation of privacy, which rests on "customs, practices, and physical settings surrounding particular activities"; (3) the intrusion is so serious in "nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms." *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 287 (2009).

89.    Here, Plaintiff and the Class possess a legally protected privacy interest, including conducting personal activities without observation, intrusion, or interference, whether those activities be interacting with friends or family, writing about one's innermost thoughts, or sharing intimate photos or information with friends or loved ones.

90.    Plaintiff and Class members have reasonable expectations of privacy in their online behavior on Facebook. The reasonableness of such expectations of privacy is supported by Facebook's statements in its SSR and its unique position to monitor Plaintiff's, Class members', and third parties' behavior on its platform. It is further supported by the surreptitious, highly-technical, and non-intuitive nature of the way in which app developers could access and download friends' data, without their knowledge or consent.

91.    Facebook's observation, intrusion, and interference with Plaintiff and Class members' activities on the social networking service constitute an invasion of privacy that is so serious in nature, scope, and actual or potential impact that it constitutes an egregious breach of social norms.

92.     The nature of the intrusion was substantial. Facebook shared intimate details about people's lives, such as their location, likes, religion, and relationship status, with any application developer who requested access, without even notifying these individuals that the app developer had obtained their information via a friend. When Facebook learned of misuse of its platform and data harvesting, it failed to take reasonable steps to secure users' information and behavioral data.

93.     The scope of the intrusion was substantial, affecting 87 million users by Facebook's estimate and involving up to 14 different Facebook profile elements.

94.     The actual or potential impact is substantial. People's Facebook information can be used to create psychographic profiles that can influence elections, be used in credit decisions, or otherwise affect their lives in significant ways. Users who had data harvested also face heightened risk of identity theft, and do not even know how many apps Facebook shared their information with.

95.     Facebook's conduct egregiously violated social norms that do not permit one person to share another person's information or behavioral data without their knowledge or consent.

96.     Plaintiff and Class members were harmed by these intrusions into their private affairs.

97.     Facebook's actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiff and Class members.

## COUNT IV: STORED COMMNICATIONS ACT
*(against all Defendants)*

98.     Plaintiff incorporates all allegations as if fully set forth herein.

99.     Plaintiff, individually and on behalf of Class members, asserts violations of the Stored Communications Act, 18 U.S.C. §§ 2702(a), for Defendants' unlawful gathering and/or disclosure of the content of Plaintiff's and Class members' communications to third parties, including but not limited to SCL Group, Cambridge Analytica, Aleksandr Kogan, and Global Science Research.

100.    The Stored Communications Act (SCA) prohibits a person from intentionally accessing without (or in excess of) authorization a facility through which an electronic communications service is provided and thereby obtaining an electronic communication while it is in "electronic storage."

101.    The SCA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and any storage of such

communication by an electronic communication service for purposes of backup protection of such communication."

102.    The servers Facebook uses to provide its electronic communications service to Facebook users are a "facility" within the meaning of the SCA.

103.    Defendants are "persons" within the meaning of the SCA.

104.    Facebook's provision of 'users' electronic communications, or information derived therefrom, to third parties exceeded authorization.

105.    Cambridge Analytica's obtaining users' electronic communications, or information derived therefrom, exceeded authorization.

106.    Because of the architecture of Facebook's servers, the sharing of information among Facebook users results in and constitutes interstate data transmissions.

107.    Pursuant to 18 U.S.C. § 2707(c), Plaintiff and Class members are entitled to:

      a.   minimum statutory damages of $1,000 per person;

      b.   punitive damages;

      c.   costs; and

      d.   reasonable attorneys' fees.

## COUNT V:  NEGLIGENCE
### (against Facebook)

108.    Plaintiff incorporates all allegations as if fully set forth herein.

109.    Facebook owed a duty to Plaintiff and the Class to exercise reasonable care in obtaining, using, and protecting their information, and keeping it from being compromised, lost, stolen, misused, and or/disclosed to unauthorized parties.

110.    Facebook also owed a duty to Plaintiff and the Class not to use their behaviors, social relationships, and intimate details in contexts and for purposes completely different from those for which this information is provided.

111.    Facebook knew that the information and behavioral data of Plaintiff and the Class was personal and sensitive information that is valuable, or that its real-time, pervasive surveillance allowed it to determine personal psychological susceptibilities that users had not disclosed.

112.     Given the nature of the information, Facebook had a special relationship with Plaintiff and the Class. Plaintiff and the Class signed up for Facebook's services and agreed to provide their information with the understanding that Facebook would undertake safeguards, would inform Plaintiff and the Class of any privacy intrusions, and would not use the information beyond its intended purpose.

113.     Facebook failed to do so by engaging in surveillance, analysis, and modification of behavior; and by allowing Cambridge Analytica and other third parties to, without notice or permission, obtain Plaintiff's and Class members' information.

114.     Facebook also breached its duties by failing to adopt, implement, and maintain adequate measures to safeguard users' information.

115.     Lastly, Facebook breached its duty to timely disclose that Plaintiff and the other Class members' information was obtained or used for behavioral and predictive analytics.

116.     But for Facebook's wrongful and negligent breach of its duties owed to Plaintiff and the Class, their information would not have been improperly used by Facebook or disclosed to Cambridge Analytica and other third parties. Facebook's negligence was a direct and proximate cause of the misuse and disclosure of Plaintiff and Class members' information, resulting in damages.

117.     The injury and harm suffered by Plaintiff and the Class members was the reasonably foreseeable result of Facebook's failure to exercise reasonable care in collecting and safeguarding Plaintiff's and the other Class members' information.

## COUNT VI: CONVERSION
### (*against all Defendants*)

118.     Plaintiff incorporates all allegations as if fully set forth herein.

119.     Plaintiff and Class members were the owners and possessors of their information and behavioral data. As a result of Defendants' wrongful conduct, Defendants have interfered with the Plaintiff's and Class members' rights to possess and control such property, to which they had a superior right of possession and control at the time of conversion.

120.     As a direct and proximate result of Defendants' conduct, Plaintiff and Class members suffered injury, damage, loss, or harm, and therefore seek compensatory damages.

121.     In converting Plaintiff's and Class members' information and behavioral data,

Defendants have acted with malice, oppression and in conscious disregard of Plaintiff's and Class members' rights. Plaintiff, therefore, seeks an award of punitive damages on behalf of the Class.

### COUNT VII: VIOLATION OF UNFAIR COMPETITION LAW (UCL)
(*against Facebook*)

122.    Plaintiff incorporates all allegations as if fully set forth herein.

123.    California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice."

124.    A business act or practice is "unfair" when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

125.    Facebook engaged in business acts and practices that are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers by, among other things: allowing developers to download friends' data without the friend's knowledge or consent; failing to enact proper safeguards to ensure that developers did not share users' data with data brokers or other third parties; failing to audit applications that accessed suspicious amounts of user data; failing to adequately ensure that developers or third parties who violated Facebook's Terms deleted the data they had obtained and were blocked from the Facebook platform; and embedding teams within election campaigns, including in the Trump campaign, to teach them how to influence elections using Facebook. The harms from these business acts and practices outweigh any potential utility.

126.    Facebook's business acts and practices offend established public policies that are tethered to specific constitutional, statutory, and/or regulatory provisions, such as the goal of protecting privacy in Article I, Section I of the California Constitution, and the legislatively declared policy of protecting data in the Customer Record Act ("CRA"), Cal. Civ. Code § 1798.81.5; Online Privacy Protection Act ("OPPA"), Cal. Bus. & Prof. Code § 22576; and the Information Practices Act ("IPA"), Cal. Civ. Code § 1798, et seq.

127.    A business act or practice is "unlawful" when it is proscribed by some other statute, regulation, or constitutional provision.

128.    Facebook engaged in business acts or practices that were proscribed by law, including

the following: Facebook violated the Stored Communications Act; Facebook engaged in unfair

business practices, in violation of § 5 of the Federal Trade Commission (FTC) Act; Facebook

systematically breached its contracts with users, in violation of Cal. Civ. Code § 1427, et seq.;

Facebook violated the terms of its consent decree with the FTC; Facebook knowingly and willfully,

and/or negligently and materially, failed to comply with "its posted privacy policy," violating Cal. Bus.

& Prof. Code § 22576; and Facebook failed to maintain reasonable procedures and practices

appropriate to the nature of the information it held to protect the information from unauthorized access,

use, modification, or disclosure, in violation of Cal. Civ. Code § 1798.81.5(b).

129.     As a direct and proximate result of Facebook's unfair and unlawful business acts and

practices, Plaintiff and the Class suffered injury in fact and lost money or property, including through:

loss of the benefit of their bargain; loss of the opportunity to control how their personal information is

used; diminution in value of their personal information; heightened, immediate, and continued risk of

fraud or identity theft; continued risk that their information, still in Facebook's possession, may be

subject to misuse; and costs associated with time, effort, and money that they expended to prevent,

detect, contest, and/or repair the impact of their information being shared in an unauthorized manner.

130.     Because of Facebook's unlawful and unfair business acts and practices, Plaintiff and

Class members are entitled to relief, including attorneys' fees and costs, restitution, declaratory relief,

and a permanent injunction enjoining Facebook from its unlawful and unfair practices. Plaintiff also

seeks reasonable attorneys' fees and costs under applicable law, including Federal Rule of Civil

Procedure 23 and California Code of Civil Procedure § 1021.5.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all Class members, requests judgment be

entered against Defendants and that the Court grant the following:

a.   An order determining that this action may be maintained as a class action under Rule 23
of the Federal Rules of Civil Procedure, that Plaintiff is a proper class representative,
that Plaintiff's attorneys be appointed Class counsel pursuant to Rule 23(g) of the
Federal Rules of Civil Procedure, and that Class notice be promptly issued;

b.   Judgment against Defendants for Plaintiff's and Class members' asserted causes of

action;

c.  Appropriate declaratory relief against Defendants;

d.  Preliminary and permanent injunctive relief against Defendants;

e.  An award of all applicable statutory damages;

f.  An award of reasonable attorneys' fees and other litigation costs reasonably incurred; and

g.  Any and all other relief to which Plaintiff and the Class may be entitled.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury for all issues so triable.

Dated: April 16, 2018                                       */s/ Eric H. Gibbs*

**GIBBS LAW GROUP LLP**
Eric H. Gibbs (SBN 178658)
Andre M. Mura (SBN 298541)
Aaron Blumenthal (SBN 310605)
505 14th Street, Ste. 1110
Oakland, CA  94612
Telephone:  510-350-9700
Facsimile:  510-350-9701
*ehg@classlawgroup.com*
*amm@classlawgroup.com*
*ab@classlawgroup.com*